UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____

IN RE:
MICHAEL P. BIBBO,                                    Chapter 7
            DEBTOR.                                  Case No. 11-44744-WCH

_____

PEOPLE'S UNITED BANK, ATTORNEY-
IN-FACT FOR THE FEDERAL DEPOSIT
INSURANCE CORPORATION, AS
RECEIVER FOR BUTLER BANK
(SUCCESSOR TO MARLBOROUGH
COOPERATIVE BANK)
            PLAINTIFF,
                                                    Adversary Proceeding
v.                                                  No. 12-4073

MICHAEL P. BIBBO,
            DEFENDANT.

_____

## MEMORANDUM OF DECISION

## I. INTRODUCTION

The matter before the Court is the "Defendant's Motion for Summary Judgment in His

Favor on All Counts of the Complaint" (the "Motion for Summary Judgment") filed by the

defendant, Michael Bibbo (the "Debtor"), and the "Plaintiff's Memorandum of Law in

Opposition to Defendant's Motion for Summary Judgment" (the "Opposition") filed by the

plaintiff, People's United Bank (the "Plaintiff").  Plaintiff filed the present adversary proceeding

objecting to Debtor's discharge on four counts, pursuant to 11 U.S.C. §§ 727(a)(2)(A) and (B),

727(a)(3), and 727(a)(4), and/or asserting that its debt is excepted from discharge pursuant to

1

§ 523(a)(4).[1]  Debtor moved for summary judgment on all counts.  For the reasons set forth

below, I will grant in part the Motion for Summary Judgment.

## II. PROCEDURAL MATTERS

Pursuant to Local Rule 56 of the United States District Court for the District of

Massachusetts, a motion for summary judgment must include "a concise statement of material

facts of record as to which the moving party contends there is no genuine issue to be tried, with

page references to affidavits, depositions, and other documentation."[2]  Similarly, an opposition to

summary judgment must be accompanied by a statement of material facts to which the opposing

party contends that there exists a genuine issue to be tried, with supporting references to the

record.[3]  All referenced documents must be filed as exhibits to the motion or opposition.[4]

Material facts set forth in the moving party's statement are deemed admitted for purposes of

summary judgment if not controverted by an opposing statement.[5]

As the local rule requires, Debtor filed a statement of material facts ("Debtor's Statement

of Facts")[6] with supporting citations to the record.  In opposition, Plaintiff provided its own

counter-statement of facts ("Plaintiff's Statement of Facts"),[7] also with supporting citations to

---

[1] Unless expressly stated otherwise, all references to the "Bankruptcy Code" or to specific sections shall be to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, 11 U.S.C. § 101, *et. seq.*

[2] LR, D. Mass. 56.1, adopted and made applicable to proceedings in the Bankruptcy Court by Massachusetts Local Bankruptcy Rule 7056-1.

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] "Defendant's Memorandum in Support of His Motion for Summary Judgment in His Favor on All Counts of the Complaint," Docket. No. 52, ¶¶ 6-56.

[7] The Opposition, Docket No. 65, Section II, ¶¶ 1-58.

the record.  The Plaintiff's Statement of Facts controverted several of Debtor's statements and provided a number of additional details.  Accordingly, the following recitation of facts draws from both parties' statements, with disputed facts noted where relevant.

## III. <u>BACKGROUND</u>

Debtor was the founder and sole officer, director, and shareholder of a corporation called Medical's Network, Inc. ("MNI").[8]  MNI's business primarily consisted of engaging doctors to provide medical record reviews and independent medical examinations for insurance companies.[9]  In 2007, MNI entered into a revolving loan agreement with Plaintiff's predecessor in interest.[10]  Debtor later became the primary obligor on the note, and MNI became the guarantor.[11]  In 2008 and 2010, respectively, Debtor delivered and executed an installment note and a term note to Plaintiff's predecessor in interest.[12]  These loans were secured by MNI's assets, Debtor's Lexus, and all of Debtor's other personal property.[13]

In 2011, MNI began to experience severe liquidity problems.[14]  As a result, MNI failed to pay doctors and other vendors who performed services for the company.[15]  In some cases, MNI's

---

[8] Debtor's Statement of Facts, ¶ 7.

[9] *Id.* at ¶ 8.

[10] *Id.* at ¶ 9.

[11] *Id.* at ¶ 11.

[12] Plaintiff's Statement of Facts, ¶¶ 1 and 2.  Debtor's and Plaintiff's accounts vary as to the specifics of the loan transactions. As the amount and validity of Plaintiff's claim is undisputed, the exact details are irrelevant.

[13] *Id.* at ¶¶ 3-4.

[14] Debtor's Statement of Facts, ¶ 14.

[15] *Id.* at ¶¶ 15, 19.

clients, the insurance companies, paid the doctors directly.[16]   This led to many of MNI's receivables becoming uncollectible, and Debtor last collected payment on the company's receivables in July 2011.[17]  By fall 2011, Debtor no longer operated MNI, as its clients refused to engage in further business with the company.[18]

MNI formerly leased office space in Marlborough, Massachusetts.[19]  In late summer 2011, MNI defaulted on the lease, and the landlord sent Debtor a notice to quit the premises on September 7, 2011.[20]  The notice stated that Debtor's access to the premises was blocked and that he could contact the landlord to retrieve the property that remained there, which included personal and business financial records, computers, and computer servers.[21]  The parties dispute whether Debtor ever attempted to retrieve the records and office equipment.[22]  Regardless, he did not retrieve them, and the landlord disposed of everything left behind.[23]  At an examination held pursuant to Fed. R. Bankr. P. 2004 (the "Rule 2004 Examination"), Debtor testified that because he was locked out of the office, he did not have access to the "proper materials" to collect MNI's receivables in the company's final months.[24]

---

[16] *Id.* at ¶ 19.

[17] *Id.* at ¶ 20; Plaintiff's Statement of Facts, ¶ 16.

[18] Debtor's Statement of Facts, ¶¶ 16-17.

[19] *Id.* at ¶ 21.

[20] *Id.* at ¶ 22; Plaintiff's Statement of Facts, ¶ 20.

[21] Debtor's Statement of Facts, Exhibit E; Plaintiff's Statement of Facts, ¶ 21.

[22] *Compare* Debtor's Statement of Facts, ¶ 23 *with* Plaintiff's Statement of Facts, ¶¶ 21-23.

[23] Debtor's Statement of Facts, ¶ 23; Plaintiff's Statement of Facts, ¶ 23.

[24] Plaintiff's Statement of Facts, ¶ 58.

Also in September 2011, Debtor's wife, Amy Osber Bibbo ("Amy Bibbo"), formed a corporation called Quality Assurance Partners, Inc. ("QAP"); she is the sole officer, director, and shareholder of the company.[25]  Amy Bibbo founded the company using her maiden name, and the articles of incorporation listed a friend's residential address as the corporation's address, although the company is run out of the Bibbos' residence.[26]  QAP's articles of incorporation, promotional materials, and 2011 tax return describe the company as providing services very similar to MNI's.[27]  Prior to founding QAP, Amy Bibbo had no experience in the medical peer review or medical records review industry.[28]

Upon the company's formation, Debtor began to work as an "independent contractor" for QAP.[29]  Debtor promotes the medical records review services of QAP's largest client, Juris Solutions, Inc. ("Juris"), to potential customers.[30]  Debtor had previously developed a relationship with Juris while he operated MNI.[31]  QAP bills Juris for Debtor's services, and Debtor's work for Juris represented the majority of QAP's revenues in 2011.[32]  According to Debtor, he does not promote Juris's services to any of MNI's former customers; however, during

---

[25] *Id.* at ¶ 24.

[26] *Id.* at ¶¶ 24-25.

[27] Debtor's Statement of Facts, ¶ 28; Plaintiff's Statement of Facts, ¶ 26.

[28] Plaintiff's Statement of Facts, ¶ 29.

[29] Debtor's Statement of Facts, ¶ 32; Plaintiff's Statement of Facts, ¶ 34.

[30] Debtor's Statement of Facts, ¶ 33.

[31] Plaintiff's Statement of Facts, ¶ 35.

[32] *Id.*

a deposition conducted by Plaintiff, he refused to reveal the names of his current clients, despite not having a confidentiality agreement with Juris.[33]

In October 2011, Plaintiff issued notices of default for the installment note and the term note on which Debtor was obligated.[34]   On November 14, 2011, Debtor filed the present bankruptcy case.[35]   On his petition, Debtor listed MNI as having a value of $25,000, although by that time he was no longer operating the company.[36]

Around the same time Debtor filed his bankruptcy petition, he left his Lexus at Kearney's Automotive in Sudbury, MA.[37]   William Kearney, the owner of Kearney's Automotive, is a longtime friend of Debtor.[38]   Debtor listed the Lexus among his assets on "Schedule B – Personal Property" of his bankruptcy petition ("Schedule B"); and on November 21, 2011, Bank filed a motion for relief from stay to repossess and sell the Lexus.[39]   On December 14, 2011, at the meeting of creditors held pursuant to 11 U.S.C. § 341 (the "341 Meeting"), Debtor informed Plaintiff's counsel of the car's location.[40]   The parties dispute whether Debtor provided Plaintiff with this information earlier.[41]

---

[33] Debtor's Statement of Facts, ¶ 33; Plaintiff's Statement of Facts, ¶ 37.

[34] Plaintiff's Statement of Facts, ¶ 6.

[35] Debtor's Statement of Facts, ¶ 36.

[36] Plaintiff's Statement of Facts, ¶¶ 12 and 19.

[37] *Id.* at ¶ 41.

[38] *Id.*

[39] *Id.* at ¶ 40.

[40] *Id.* at ¶ 44.

[41] *Compare* Debtor's Statement of Facts, ¶ 41 *with* Plaintiff's Statement of Facts, ¶¶ 42-44.

On December 20, 2011, Plaintiff obtained relief from the automatic stay to repossess and sell the Lexus.[42]   Plaintiff asked Kearney to turn over the car, but he refused to release it unless Plaintiff paid a storage fee of $35 per day, which by that time was in excess of $2,000.[43] Plaintiff was unable to negotiate successfully with Kearney and filed suit against him in state court.[44]   Plaintiff incurred legal expenses of over $2,500 before Kearney agreed to turn over the car.[45]   In September 2012, Plaintiff liquidated the car at an auction for $9,000.[46]   Plaintiff never requested Debtor's assistance in retrieving the car.[47]

During his Rule 2004 Examination, Debtor testified that he never agreed to pay Kearney storage fees for the Lexus, and did not expect to pay such fees.[48]   Debtor further stated that he left the car with Kearney to avoid the embarrassment of it being repossessed from his home.[49]

On Schedule B, Debtor listed "Household Furnishings and Personal Items" in the amount of $1,250.[50]   At the 341 Meeting, counsel for Plaintiff asked a series of questions concerning what items Debtor meant by "household furnishings."[51]   Debtor testified to having a watch, a

---

[42] Debtor's Statement of Facts, ¶ 43.

[43] Plaintiff's Statement of Facts, ¶ 45.

[44] *Id.* at ¶ 46.

[45] *Id.* at  ¶ 47.

[46] *Id.*

[47] Debtor's Statement of Facts, ¶ 46.

[48] Plaintiff's Statement of Facts, ¶ 49.

[49] *Id.* at ¶ 48.

[50] Debtor's Statement of Facts, ¶ 37.

[51] *Id.* at ¶ 42.

couch, two televisions, a computer, and other furniture.[52]   At the Rule 2004 Examination, Plaintiff's counsel further questioned Debtor concerning his "household furnishings."   At that time, Debtor testified that the same personal property consisted of, "couches, end table, I think lamps, a [kitchen/dining room] table."[53]  He testified that he had no interest in the other furniture in the house, including the televisions, because his wife had purchased it all.[54]

Later, in connection with this action, Plaintiff subpoenaed documents from Amy Bibbo.[55] In response to the subpoena, Amy Bibbo produced receipts for numerous items of household furniture and a television set.[56]  The receipts were all addressed to Debtor, not his wife.[57]

On July 11, 2012, Plaintiff commenced the present adversary proceeding asserting four bases for denial of Debtor's discharge and one for excepting its debt from discharge.  Count I objected to Debtor's discharge under § 727(a)(2)(A), alleging that he fraudulently transferred MNI's assets to QAP in order to shield the company's value from creditors.[58]  Count II objected to Debtor's discharge under § 727(a)(2)(B), alleging that he concealed his Lexus with Kearney in order to hinder Plaintiff's efforts to repossess it.[59]   Count III alleged that Debtor failed to adequately keep records pursuant to § 727(a)(3) because Debtor did not retrieve MNI's property

---

[52] *Id.*

[53] Plaintiff's Statement of Facts, ¶ 53.

[54] *Id.*

[55] *Id.* at ¶ 54.

[56] *Id.*

[57] *Id.*

[58] "Complaint Objecting to Discharge of Debtor and Seeking Determination of Non-Dischargeability of Debt" (the "Complaint"), Docket No. 2, ¶¶ 74-85.

[59] *Id.* at ¶¶ 86-99.

from its former office space.[60]   Count IV alleged that Debtor's failure to disclose all of his household furnishings on Schedule B constituted a false oath under § 727(a)(4).[61]   Finally, Count V alleged that Debtor's transfer of MNI's assets to QAP constituted fraud or defalcation while acting in a fiduciary capacity, rendering Plaintiff's debt nondischargeable pursuant to § 523(a)(4).[62]

Debtor filed the Motion for Summary Judgment on August 5, 2013.   On September 9, 2013, Plaintiff filed the Opposition.   I heard the motion on September 11, 2013, and, after the conclusion of oral arguments, took the matter under advisement.

## IV. <u>POSITIONS OF THE PARTIES</u>

### A.  <u>The Debtor</u>

With respect to Count I, Debtor argues that Plaintiff has no evidence of any specific assets that he transferred from MNI to QAP.   Debtor contends that evidence of a specific transfer is necessary overcome summary judgment on a § 727(a)(2)(A) claim.   Debtor further claims that MNI had no assets to transfer, because its goodwill, receivables, and customer base were valueless by the time Amy Bibbo formed QAP.   Moreover, Debtor contends that the allegedly transferred assets belonged to MNI as a distinct corporate entity and thus were not "property of the debtor," as § 727(a)(2)(A) requires.   Finally, Debtor argues that even if QAP was a mere continuation of MNI, as Plaintiff claims, that alone is not evidence of fraudulent intent.

As to Count II, Debtor asserts that he did not conceal the Lexus from Plaintiff, since he disclosed the Lexus on Schedule B and informed Plaintiff of the car's location.   Debtor also

---

[60] *Id.* at ¶¶ 100-110.

[61] *Id.* at ¶¶ 111-119.

[62] *Id.* at ¶¶ 120-123.

relies on Plaintiff's statement that Debtor did not preclude its repossession from Kearney. Moreover, Debtor argues that it would be inequitable to deny his discharge for concealing a fully encumbered asset, which Plaintiff never asked him to turn over.

With respect to Count III, Debtor primarily relies on the fact that, both pre- and post-petition, he provided Plaintiff with tax returns, bank account documents, and MNI's financial statements.  Debtor claims that at all times Plaintiff was fully able to ascertain his financial condition, and that any records seized by the landlord were otherwise available and provided to Plaintiff.  Debtor further argues that any failure to produce records was justified, because he and his attorney contacted the landlord to retrieve the files and computers left on the office premises, but the landlord refused to cooperate.

As to Count IV, Debtor argues that listing $1,250 of "Household Furnishings and Personal Items" on Schedule B was sufficient disclosure of his personal property.  Debtor asserts that the schedule put interested parties on inquiry notice of the referenced assets, and that more specificity was not required.  Debtor further contends that his testimony during the 341 Meeting and the Rule 2004 Examination gave creditors actual notice of the items to which Schedule B referred.

Finally, regarding Count V, Debtor argues that a breach of a commercial debt contract does not give rise to liability under § 523(a)(4).  Debtor points out that his debt to Plaintiff arose years before the alleged transfer of assets from MNI to QAP.  Thus, as the alleged defalcation in a fiduciary capacity did not *cause* his debt to Plaintiff, Debtor maintains that § 523(a)(4) is inapplicable.

B.  The Plaintiff [63]

With respect to Count I, Plaintiff argues that there is a disputed issue of material fact as to whether Debtor transferred MNI's goodwill and client contacts to QAP.  Plaintiff contends that Amy Bibbo formed QAP to carry on MNI's business through a different entity.  In support, Plaintiff points to Amy Bibbo's lack of experience in the field, the fact that QAP's biggest client, Juris, is a contact Debtor obtained through MNI, and Debtor's refusal to disclose the potential customers he contacts on behalf Juris.  Further, Plaintiff disputes that MNI was worthless when QAP was formed, noting that Debtor listed its value as $25,000 on his bankruptcy petition.

With regard to whether the assets in question were "property of the debtor," Plaintiff maintains that because MNI is an insider of Debtor, § 727(a)(7) applies to bar the discharge. Alternately, Plaintiff asserts there is evidence to support piercing the corporate veil, alleging that Debtor failed to observe corporate formalities and operated MNI as his alter ego.  Lastly, Plaintiff argues that the circumstances surrounding QAP's formation indicate fraudulent intent on the part of Debtor.

As to Count II, Plaintiff argues that when Debtor learned of Plaintiff's intent to repossess, he concealed the Lexus with Kearney, and did not disclose its location until asked under oath at the 341 Meeting.  Plaintiff asserts that the only possible explanation for Debtor's storing the Lexus with Kearney was to hinder its repossession.  Plaintiff contends that Debtor needlessly delayed its foreclosure by almost a year and caused Plaintiff to incur litigation expenses.

---

[63] In its Opposition, Plaintiff raises new factual grounds for denying Debtor's discharge.  Plaintiff asserts that Debtor obtained an "equitable interest" in QAP by working for the company without compensation, and that his failure to list this interest as an asset on his bankruptcy petition constituted both concealment of an asset pursuant to § 727(a)(2)(A) and a false oath pursuant to § 727(a)(4).  *See* The Opposition, ¶¶ 76, 99.  As these allegations did not appear in the Complaint, I will not address them further.  *See Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jimenez*, 659 F.3d 42, 53 (1st Cir. 2011) ("A plaintiff may not amend [a] complaint through argument in a brief opposing summary judgment.") (*quoting Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).

With respect to Count III, Plaintiff relies on Debtor's admissions that he left financial records, computers, and computer servers at MNI's former office, and that he was unable to collect receivables because the "proper materials" were left there.  Plaintiff argues that these records were material to Debtor's bankruptcy, because they would have permitted Plaintiff to ascertain the value of the receivables.  Plaintiff disputes that Debtor attempted to retrieve the records, claiming that he simply abandoned them on the office premises.  Plaintiff also contends that Debtor has failed to produce or keep other records, such as documentation of Amy Bibbo's capital contributions to MNI and various corporate records.

As to Count IV, Plaintiff claims that Debtor knowingly made a false statement by undervaluing his personal property on Schedule B.  Plaintiff primarily relies on Debtor's statement during the Rule 2004 Examination that certain household furniture belonged to his wife, when receipts obtained by Plaintiff indicate that Debtor himself purchased the property.  Plaintiff maintains that Debtor left this property off of Schedule B, and that this nondisclosure was material because it concerned the discovery of assets and the existence of estate property.

Finally, regarding Count V, Plaintiff asserts that under Massachusetts law a corporate officer or director serves in a fiduciary capacity with respect to the corporation and its shareholders.  Thus, Plaintiff argues that when Debtor transferred MNI's assets to QAP for no consideration, it constituted defalcation in a fiduciary duty pursuant to § 523(a)(4).

## V. <u>DISCUSSION</u>

### A. <u>The Summary Judgment Standard</u>

Pursuant to Fed. R. Civ. P. 56, "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

12

judgment as a matter of law."[64]   A dispute is genuine if the evidence is such that a reasonable

jury could resolve the issue in favor of the nonmoving party.[65]   A fact is material if it has the

potential to determine the outcome of the suit under the governing law.[66]

The moving party bears the initial burden of demonstrating that "the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact."[67]   In cases like this one, however, "where the nonmoving party will bear

the burden of proof at trial,"[68] the moving party may either produce evidence negating an

essential element of the nonmoving party's claim or simply show that there is an absence of

evidence to support the nonmoving party's case.[69]   After such a showing, the burden shifts to the

nonmoving party to "go beyond the pleadings" and produce evidence of "specific facts showing

that there is a genuine issue for trial."[70]   "'[C]onclusory allegations, improbable inferences, and

unsupported speculation,'" are insufficient to establish a genuine issue of fact.[71]

B. Count I: Transfer of Property of the Debtor Under § 727(a)(2)(A)

Section 727(a)(2)(A) provides, in relevant part:

(a) The court shall grant the debtor a discharge, unless —

---

[64] Fed. R. Civ. P. 56(a), made applicable to adversary proceedings by Fed. R. Bankr. P. 7056.

[65] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[66] *Id.*

[67] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[68] *Id.* at 324.

[69] *Id.* at 325.

[70] *Id.* at 324 (internal quotations omitted).

[71] *Triangle Trading Co., Inc. v. Robroy Indus., Inc.,* 200 F.3d 1, 2 (1st Cir. 1999) (*quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)).

\* \* \*

> (2) the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed

\* \* \*

> (A) property of the debtor, within one year before the date of the filing of the petition.[72]

The party objecting to the discharge must prove "(1) a transfer or concealment of property; (2) belonging to the debtor; (3) within one year of filing a petition for bankruptcy; and (4) with the actual intent to hinder, delay or defraud the creditor." [73] When a debtor has transferred the property of a distinct corporate entity, not his own property, § 727(a)(2)(A) does not apply.[74]

Plaintiff has failed to raise a genuine issue of material fact as to the second element of a § 727(a)(2)(A) claim—that the allegedly transferred property belonged to the debtor. Plaintiff's central argument is that Debtor shifted the going concern value *of MNI* into QAP to shield MNI's value from creditors. The specific assets that Plaintiff alleges Debtor transferred are MNI's goodwill and client contacts. Even assuming, *arguendo*, that such a transfer occurred, Plaintiff has not shown that these assets were "property of the debtor" as the statute requires.[75]

In its Opposition, Plaintiff argues that the corporate veil should be pierced, alleging that Debtor operated MNI as his alter ego. Neither this veil-piercing theory, nor any of the facts that Plaintiff submits to support it, appeared in the Complaint. Accordingly, this argument is

---

[72] 11 U.S.C. § 727(a)(2)(A).

[73] *Razzaboni v. Schifano (In re Schifano)*, 378 F.3d 60, 66-67 (1st Cir. 2004).

[74] *See Groman v. Watman* (*In re Watman*)*, 458 F.3d 26, 31 n.3 (1st Cir. 2006); *Hulsing Hotels Tennessee, Inc., v. Steffner* (*In re Steffner*), 479 B.R. 746, 761 (Bankr. E.D. Tenn. 2012) ("It is black-letter law that the property of a corporation or limited liability company belongs to that entity, not the owners of the entity, even if the corporation has only one shareholder or member."); *Miller v. Scott* (*In re Scott*), 462 B.R. 735, 741 (Bankr. D. Alaska 2011) (collecting cases).

[75] 11 U.S.C. § 727(a)(2)(A).

untimely.[76] Similarly, Plaintiff argues for the first time in the Opposition that § 727(a)(7) applies to bar Debtor's discharge, because Debtor transferred the property of an insider in a way that meets the elements of § 727(a)(2). This argument is both untimely and inapposite. Section 727(a)(7) requires a debtor to have transferred the property of an insider "in connection with *another case*, under this title or under the Bankruptcy Act."[77] As MNI never filed bankruptcy, § 727(a)(7) is inapplicable. Accordingly, there is no genuine issue of material fact as to an essential element of the § 727(a)(2)(A) claim—whether the allegedly transferred property belonged to Debtor—and summary judgment for Debtor is appropriate.

C. Count II: Concealment of Property of the Estate Under § 727(a)(2)(B)

Section 727(a)(2)(B) provides, in relevant part:

(a) The court shall grant the debtor a discharge, unless —

\* \* \*

(2) the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed

\* \* \*

(B) property of the estate, after the date of the filing of the petition.[78]

The party objecting to the discharge must show that: (1) the debtor transferred, removed, destroyed, mutilated, or concealed; (2) property of the estate; (3) postpetition; (4) with intent to hinder, delay or defraud a creditor.[79]

---

[76] *See In re Scott*, 462 B.R. at 742 (granting summary judgment for the debtor on a § 727(a)(2) claim when the creditor's complaint alleged a transfer of corporate assets, and the creditor did not raise an alter ego theory until opposing a motion for summary judgment); *see also Cambridge Tempositions, Inc. v. Cassis (In re Cassis)*, 220 B.R. 979, 985 (Bankr. N.D. Iowa 1998) (dismissing a creditor's § 727(a)(2) claim when the complaint alleged a transfer of corporate assets, but did not allege an alter ego theory).

[77] 11 U.S.C. § 727(a)(7) (emphasis added).

[78] 11 U.S.C. § 727(a)(2)(B).

As to the first three elements, it is undisputed that: (1) Debtor removed the Lexus to Kearney's Automotive; (2) the Lexus was property of the estate; and (3) the removal occurred post-petition.  As to the fourth element, Plaintiff has raised a genuine issue of material fact by submitting evidence that Debtor acted with intent to hinder or delay its repossession of the Lexus.  Debtor testified that he removed the car to Kearney's lot in order to avoid "the embarrassment" of having the car repossessed from his home.  Thus, Debtor was at the very least aware that his actions would affect Plaintiff's repossession efforts.  Debtor and Plaintiff dispute whether Debtor promptly notified Plaintiff of the car's changed location.  Additionally, Kearney, a long-time friend of debtor, refused to turn the car over to the bank unless Bank paid over $2,000 in storage fees, even though Debtor testified he never agreed to pay such fees.  Ultimately, Plaintiff's repossession was delayed for months, and Plaintiff was forced to incur litigation expenses to obtain possession of the car.  From all of these circumstances, a reasonable factfinder could infer that Debtor acted with the intent to hinder or delay Plaintiff's repossession of the Lexus.

Debtor's arguments to the contrary are unavailing. Debtor argues that because he informed Plaintiff of the car's location, and Plaintiff never asked for his help to retrieve the car from Kearney, he did nothing to hinder or delay Bank's repossession.  Debtor's argument speaks only to what occurred *post-removal*.[80]  Once a debtor has transferred property in a way that meets the elements of § 727(a)(2), the debtor's later actions do not defeat a claim under that

---

[79] *Nickless v. Fontaine* (*In re Fontaine*), 467 B.R. 267, 274 (Bankr. D. Mass. 2012) (*citing Groman v. Watman (In re Watman)*, 301 F.3d 3, 7 (1st Cir. 2002)).

[80] Similarly, Debtor relies on an admission by Plaintiff that Debtor did nothing to hinder Plaintiff's repossession *after* the Lexus was already at Kearney's Automotive.

section.[81]   There is a genuine issue of material fact as to whether Debtor intended to hinder or delay Plaintiff's repossession when Debtor removed the Lexus from his home.  Thus, summary judgment is inappropriate.

     D. <u>Count III: Failure to keep records Under § 727(a)(3)</u>

     Section 727(a)(3) provides:

     (a) The court shall grant the debtor a discharge, unless —

* * *

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.[82]

The party objecting to the discharge must show: (1) "that the debtor concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information;" and (2) "that the recorded information was information from which the debtor's financial condition or business transactions might be ascertained."[83]   Once the objecting party has proven these two elements, "the burden shifts to the debtor to prove that such act or failure to act was justified under the circumstances of the case."[84]

     It is undisputed that Debtor failed to preserve the personal and business records kept on MNI's former office premises, but the parties dispute whether the records contained information from which his financial condition or business transactions might be ascertained.   Debtor

---

[81] *Cf. Martin v. Bajgar  (In re Bajgar)*, 104 F.3d 495, 498-502 (1st Cir. 1997) (denying a debtor's discharge for a fraudulent transfer of assets pursuant to § 727(a)(2)(A), even though the debtor voluntarily reversed the transfer post-petition).

[82] 11 U.S.C. § 727(a)(3).

[83] *Lassman v. Keefe (In re Keefe)*, 380 B.R. 116, 120 (Bankr. D. Mass. 2007) (internal quotations omitted).

[84] *Id.* (internal quotations omitted).

maintains that both pre- and post-petition he provided Plaintiff with ample financial information, including tax returns, bank account documents, financial statements, and receivables aging reports.  That said, Debtor also testified that he was unable to attempt to collect receivables because the "proper materials" were locked up in MNI's former office.  Moreover, Plaintiff has pointed to a number of documents that Debtor has been unable to produce, such as corporate records and documentation of Amy Bibbo's investments in the corporation.  Taking the evidence in the light most favorable to Plaintiff, there is a genuine issue as to whether Debtor failed to keep or preserve records that would illumine his financial condition or business transactions.

Finally, the parties dispute whether Debtor made any effort to recover the records.  Debtor claims he contacted the landlord, but the landlord was uncooperative.  Plaintiff, on the other hand, contends that Debtor abandoned the records on the office premises and never made any attempt to retrieve them.  Thus, there is a genuine issue of material fact as to whether Debtor's failure to keep records was justified.  Accordingly, summary judgment is inappropriate.

### E. Count IV: Making a False Oath Under § 727(a)(4)(A)

Pursuant to 11 U.S.C. § 727(a)(4)(A), "[t]he court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."[85]  The party objecting to the discharge must show the debtor: (1) "knowingly and fraudulently;" (2) "made a false oath in or in connection with the case;" (3) "relating to a material fact."[86]  "A material fact under § 727(a)(4) is one that has a non-trivial effect upon the estate and creditors."[87]  A statement is generally material if it "bears a

---

[85] 11 U.S.C. § 727(a)(4)(A).

[86] *In re Fontaine*, 467 B.R. at 271.

[87] *Id.* at 272.

relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of property."[88]  Reckless indifference to the truth qualifies as fraud for the purposes of § 727(a)(4)(A), however, "courts will not construe an ignorant or inadvertent omission as evidence of fraudulent intent."[89]

The essential facts relating to Count IV are in dispute.  Debtor asserts that his Schedule B was complete and accurate.  Plaintiff, on the other hand, contends that Debtor omitted household furnishings from Schedule B.  Indeed, Debtor testified at the Rule 2004 Examination that his household furnishings consisted of "couches, end table, I think lamps, a [kitchen/dining room] table."  He testified that all the other furniture and the televisions in his home were purchased and owned by his wife.  To contradict this claim, Plaintiff has submitted receipts addressed to Debtor for a television and numerous items of furniture other than those Debtor testified to owning.  A reasonable factfinder could conclude from Debtor's testimony and the receipts that Debtor undervalued his household furnishings on Schedule B by omitting items that belonged to him.  Such an omission or undervaluation of assets can constitute a false oath under § 727(a)(4).[90]

Debtor's argument that he was not required to provide a more detailed listing misses the mark.  Certainly, Debtor was not required to list every individual item of his furniture on Schedule B.  He was nevertheless obligated to disclose and value his assets fully and accurately.  Debtor has neither explained the basis for the $1,250 valuation, nor has he responded directly to

---

[88] *Id.* (*quoting Boroff v. Tully (In re Tully)*, 818 F.2d 106, 111 (1st Cir. 1987)).

[89] *Id.* (*quoting JP Morgan Chase Bank v. Koss (In re Koss)*, 403 B.R. 191 (Bankr. D. Mass. 2009)).

[90] *See, e.g., Lussier v. Sullivan (In re Sullivan)*, 455 B.R. 829, 837-839 (B.A.P. 1st Cir. 2011).

Plaintiff's allegations concerning the ownership the furniture shown on the receipts. Accordingly, there is a genuine issue as to whether Debtor made a false oath on Schedule B.

Next, because Debtor has not explained the basis for his valuation, it is impossible to ascertain whether any omission of assets was material, as opposed to a "technical but harmless error[ ]." Lastly, if Debtor did in fact buy the assets in question, he must have known that he did so. It is thus reasonable to infer that any omission of the property from Schedule B was an intentional or reckless falsehood. Accordingly, summary judgment is inappropriate on Count IV.

F. Count V: Defalcation while Acting in a Fiduciary Capacity Under 523(a)(4)

Pursuant to 11 U.S.C. § 523(a)(4), "[a] discharge under section 727 . . . does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity . . . ."[91] The party objecting to the debtor's discharge must show: (1) that the debt "result[s] from a fiduciary's defalcation under an express or technical trust;" (2) that the debtor "acted in a fiduciary capacity with respect to the trust;" and (3) that the transaction in question is a "defalcation within the meaning of bankruptcy law."[92] "This bar to discharge reaches debts incurred through abuses of fiduciary positions."[93]

It is undisputed that Debtor's debt to Plaintiff arose from a series of commercial loan transactions occurring between 2008 and 2010. Plaintiff alleges that Debtor violated a fiduciary obligation by misappropriating MNI's business assets and transferring them to QAP in 2011. Thus, there is no question that the debt did not "result" from Debtor's actions. In fact, Plaintiff's Opposition ignores this statutory requirement and addresses only whether Debtor was a fiduciary

---

[91] 11 U.S.C. § 523(a)(4).

[92] *Raso v. Fahey (In re Fahey)*, 482 B.R. 678, 687 (B.A.P. 1st Cir. 2012) (internal quotations omitted).

[93] *Id.* (quoting *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir.2011)).

and whether Debtor committed fraud or defalcation in that capacity.  Even assuming Plaintiff's allegations are true, the debt was "incurred" as a commercial business loan; it did not result from fraud or defalcation committed in a fiduciary capacity.[94]  Accordingly, Debtor is entitled to summary judgment on Count V.

## VI. <u>CONCLUSION</u>

In light of the foregoing, I will enter an order granting summary judgment on Counts I and V and denying summary judgment on Counts II, III, and IV.

_____
William C. Hillman
United States Bankruptcy Judge

Dated: October 29, 2013


Counsel Appearing:

Michael J. Duffy, Ruberto, Israel, & Weiner, P.C., Boston, MA,
    for the Debtor
Anthony L. Gray, Pollack & Flanders, LLP, Boston, MA,
    for People's United Bank

---

[94] *Id.*; *see also Commerce Bank & Trust Co. v. Burgess (In re Burgess)*, 955 F.2d 134, 140 (1st Cir. 1992), *abrogated on other grounds by Field v. Mans*, 516 U.S. 59 (1995) (holding § 523(a)(4) did not apply to a commercial debt relationship); *Follett Higher Education Group, Inc. v. Berman (In re Berman)*, 629 F.3d 761, 767-68 (7th Cir. 2011) (holding that when a corporation breached a contract, the "resulting obligation to the creditor" was not "one arising from a trust.").